H2FDKANM

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     KALI KANONGATAA,
 3
                 Plaintiff,              New York, N.Y.
 4
             v.                          16 Civ. 07382(LAK)
 5
     AMERICAN BROADCASTING
 6   COMPANIES, INC. and
     YAHOO!INC.,
 7
                 Defendants.
 8   ------------------------------x
     KALI KANONGATAA,
 9
                 Plaintiff,              New York, N.Y.
10
             v.                          16 Civ. 07383(LAK)
11
     NBCUNIVERSAL MEDIA, LLC,
12
                 Defendant.
13   ------------------------------x
     KALI KANONGATAA,
14
                 Plaintiff,              New York, N.Y.
15
             v.                          16 Civ. 07472(LAK)
16
     COED MEDIA GROUP, LLC,
17
                 Defendant.
18   ------------------------------x
19                                       February 15, 2017
                                         10:05 a.m.
20
     Before:
21
                       HON. LEWIS A. KAPLAN,
22
                                         District Judge
23

24

25
```

H2FDKANM

APPEARANCES


LIEBOWITZ LAW FIRM PLLC
     Attorneys for Plaintiff
BY:  YEKATERINA TSYVKIN
     RICHARD LIEBOWITZ

LEVINE SULLIVAN KOCH & SCHULZ, LLP
     Attorneys for Defendants ABC and Yahoo! Inc.
BY:  NATHAN ELLIS SIEGEL

NBC UNIVERSAL TALENT NEGOTIATIONS AND LABOR RELATIONS
     Attorneys for Defendant NBCUniversal Media, LLC
BY:  ERIK BIERBAUER
     SAMANTHA WILLIAMS

COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP
     Attorneys for Defendant COED Media Group, LLC
BY:  SCOTT JONATHAN SHOLDER


                          oOo

          THE COURT:  Good morning, all.

          THE CLERK:  Kanongataa against ABC, et al.

          Counsel for Kanongataa, are you ready?

          MS. TSYVKIN:  Yes.

          THE CLERK:  And you are?

          MR. BIERBAUER:  Yekaterina Tsyvkin.

          Good morning, your Honor.

          THE COURT:  Good morning.

          THE CLERK:  And counsel for ABC and Yahoo! --

          THE COURT:  Well, we have another entrant.

          MR. LIEBOWITZ:  Richard Liebowitz, Liebowitz Law Firm

counsel for plaintiff, Kali Kanongataa.

          Good morning, your Honor.

1        THE COURT:  Good morning.

2        THE CLERK:  Counsel for ABC and Yahoo!, are you ready?

3        MR. SIEGEL:  Yes.  David Siegel.

4        Good morning, your Honor.

5        THE COURT:  Good morning.

6        THE CLERK:  Counsel for NBCUniversal Media, are you

7   ready?

8        MR. BIERBAUER:  Yes.  Erik Bierbauer, from

9   NBCUniversal Law Department, here with my colleague Samantha

10  Williams, our law clerk.

11       THE COURT:  Good morning.

12       THE CLERK:  Counsel for COED Media Group, are you

13  ready?

14       MR. SHOLDER:  Yes.  Good morning.  Scott Sholder, from

15  Cowan, DeBaets, Abrahams & Sheppard, on behalf of COED Media

16  Group.

17       THE COURT:  Good morning.

18       MR. SHOLDER:  Good morning.

19       THE COURT:  I apologize in advance for my voice and

20  for the delay.  The delay was caused by the electronic gremlins

21  that have affected every piece of my equipment this whole week.

22  Nothing has worked on turnon, but eventually Andy gets it

23  going.  And I seem to have the cold that most other people that

24  I know have.

25       So, in any case, I am happy to hear from you.  So, who

1   is going to lead off for the defense?

2           MR. BIERBAUER:  That will be me, your Honor.

3           THE COURT:  OK.  If you would go to the podium,

4   please, the audio will be a little bit better.

5           MR. BIERBAUER:  So, Erik Bierbauer for NBCUniversal.

6           The way we decided among ourselves to divide this is

7   that I will address the fair use argument, and then Mr. Sholder

8   will address the DMCA point which is unique to COED Media and,

9   any questions that the Court may have that relate to any

10  particular defendant of course can be handled by the relevant

11  defense counsel.

12          THE COURT:  OK.

13          MR. BIERBAUER:  So this case presents a

14  straightforward application of the fair use doctrine, whether,

15  intentionally or unintentionally, the plaintiff created a

16  newsworthy event.  It was apparently the first time that anyone

17  used Facebook to publicly live stream the birth of a child.

18  Now, the plaintiff seeks to use a copyright lawsuit to get paid

19  by the news organizations that covered that news and commented

20  on it.

21          THE COURT:  Let me interrupt with a question.

22          I infer -- tell me if I am wrong or right -- that your

23  position would be the same even if the plaintiff had live

24  streamed this only to the smaller group than he in fact live

25  streamed it had it come to the attention of your client, right?

H2FDKANM

1          MR. BIERBAUER:  Well, I don't know that it would have

2    been newsworthy, and I don't know that it would have been

3    picked up as news in that circumstance.

4          THE COURT:  Well, the second question is pretty

5    speculative.  If it had stayed within that group and you hadn't

6    learned about it, obviously it wouldn't have been picked up.

7    If it had --

8          MR. BIERBAUER:  It would not have been picked up if it

9    had not been public and therefore available to be picked up and

10   the video used.

11         THE COURT:  What does "public" mean in this context?

12         MR. BIERBAUER:  Well, certainly it is public when it

13   is made available to the one-billion-plus members of Facebook

14   who had access to the video.

15         THE COURT:  That's not an issue.  I mean, that is

16   pretty clear.

17         He claims, without benefit of any affidavit or other

18   evidence or even allegations in the pleadings, that he thought

19   he was live streaming to something short of a billion people.

20   I take it we don't know how many, is that right?

21         MR. BIERBAUER:  There is no allegation in the

22   complaint as to how many.  I would say, with respect, that it

23   is irrelevant as to whether he intentionally or unintentionally

24   made it publicly available --

25         THE COURT:  OK.

1          MR. BIERBAUER:  -- to the general public.

2          THE COURT:  That was really the thrust of my question.

3     Your position would be the same, if I understand you, if he had

4     live streamed only to a smaller group, the group he says,

5     whatever it is, he intended to live stream to, and, of course,

6     the assumption of asking the question is and that somehow or

7     another it came to the attention of the media and you did

8     exactly the same thing you did given that it was live streamed

9     to a billion people; is that your position?

10          MR. BIERBAUER:  It's a difficult hypothetical, your

11     Honor, because if in fact --

12          THE COURT:  That is what you get paid for.

13          MR. BIERBAUER:  -- he had streamed it to a very

14     limited group of people, then that event would not be

15     newsworthy.  It would not be what was covered by the

16     defendants.

17          What the defendants were covering was the fact that

18     someone, whether he meant to or he didn't mean to, live

19     streamed to the entire world, essentially, something which was

20     traditionally a more intimate, personal event.

21          THE COURT:  Let me inquire, first of Mr. Siegel and

22     then of Mr. Sholder, whether your clients agree with that

23     position?

24          MR. SIEGEL:  I think, your Honor, my -- from a

25     copyright perspective, I think the answer to your question is

1    yes, it probably wouldn't be different.  I think part of -- it

2    would be a news judgment, right, for ABC as to whether or not

3    that smaller audience was newsworthy, and there might be other

4    considerations that would inform that news judgment -- privacy,

5    maybe even legal considerations, right?  But I think from a --

6    in other words, it would inform the judgment of a reporter as

7    to whether or not, even assuming that they got ahold of that

8    video that had been streamed to a smaller audience, whether

9    they deemed that something that they thought they wanted to

10   comment on --

11             THE COURT:  Yeah.  But the assumption of my question

12   is that somehow they learned and got access to the video

13   streamed to a much narrower audience and made the judgment, the

14   news judgment, to go with it and then did substantially the

15   same thing they did with the piece that we're concerned about

16   here.

17             MR. SIEGEL:  Yes.  From the perspective of copyright

18   law and fair use, my answer would be yes, assuming, of course,

19   there weren't any extraneous facts like somebody had purloined

20   the video or somehow obtained it in some, you know, nefarious

21   way.  But assuming that the video --

22             THE COURT:  Like maybe being leaked from the NSA.

23             MR. SIEGEL:  Well, I think from where I stand --

24             THE COURT:  To take an absurd hypothetical.

25             MR. SIEGEL:  From where I stand, I wouldn't consider

1    that nefarious from the perspective of the press.

2              THE COURT:  That was my point.

3              MR. SIEGEL:  Yes.  But, yes, from a pure copyright

4    point of view, if for some reason, you know, someone made the

5    judgment that that was news and they wanted to comment on it, I

6    don't think any of the other fair use -- any of the fair use

7    factors and used in the transformative way, etc., would be any

8    different.

9              THE COURT:  Thank you.

10             Mr. Sholder.

11             MR. SHOLDER:  I'm in agreement with what my

12   codefendants have said.  I will just add that --

13             THE COURT:  Well, what they have said is somewhat at

14   odds.  So, which codefendant are you agreeing with?

15             MR. SHOLDER:  I think I'm aligned with Mr. Siegel in

16   the sense that it's not all that relevant as to whether the

17   audience was tremendous or slightly more limited.  I think, to

18   his point, it is more newsworthy that it was larger.

19             THE COURT:  How about dramatically more limited?

20             MR. SHOLDER:  Well, then that goes to the issue of how

21   was that information obtained.  But I think the question is of

22   intent.  When you are talking about publication, I think some

23   part of the --

24             THE COURT:  What question is one of intent, exactly,

25   and whose intent?

1        MR. SHOLDER:  As a part of the fair use analysis, at

2   least on the -- in the opposition, the plaintiff's opposition,

3   there is an argument that if the publication was unintentional,

4   it should be deemed unpublished and, therefore, less likely to

5   be fair use.  I don't think there is case law support for that,

6   and I don't think the intention matters.

7        So if it was intentionally live streamed to a larger

8   audience or a smaller audience, if it was newsworthy and in the

9   news judgment of the defendants they decided to report on that,

10  and in my client's case to use a screenshot and a link back to

11  the actual video so that people could look at it at the source,

12  I don't think the analysis -- I don't think the outcome

13  changes.

14       THE COURT:  OK.  Thank you.

15       MR. BIERBAUER:  If I may, your Honor?  I think your

16  hypothetical is similar to the facts in the Swatch v. Bloomberg

17  case that the Second Circuit decided in 2014, because there

18  Swatch intended to publish the contents of this analyst call to

19  the people who were on the call.  I believe that was something

20  on the order of 2 or 300 participants.  Bloomberg acquired it

21  and then published that to its much larger audience, and the

22  Second Circuit affirmed the district court's ruling on summary

23  judgment, with no discovery, that in fact that was a fair use

24  and the case was properly dismissed.

25       So I think as a matter of copyright, yes, Mr. Siegel

1   is absolutely correct.  Setting aside whether it would be

2   newsworthy under any circumstances for someone to be live

3   streaming the birth of a child to a much smaller group, as a

4   matter of copyright it would in fact remain fair use if it were

5   a smaller audience and it was then picked up and judged to be

6   newsworthy.

7            THE COURT:  OK.  Thank you.  Go ahead.

8            MR. BIERBAUER:  So I think there are two points that I

9   would like to highlight here.  The first is that it is

10  appropriate for the Court to address the fair use defense at

11  the motion to dismiss stage in the circumstances of this case

12  and that there is no reason to let the case proceed further.

13  There is no discovery that would be discovered that could

14  change the fair use analysis.  And, second -- and this is

15  related, of course -- is that it's plain at this stage that the

16  defendants' use of plaintiff's video were fair.  All four of

17  the fair use factors tilt decisively in this case in the

18  defendants' favor, and that this is essentially as clear a case

19  of fair use as I think we are ever likely to see.

20           In terms of the stage of the proceedings, plaintiff

21  concedes in his opposition that in the Second Circuit in

22  certain circumstances, according to the Cariou case, fair use

23  may be established at the motion to dismiss stage simply by

24  placing the copyrighted work and the purportedly infringing

25  work side-by-side and comparing their characteristics, and that

1    is exactly what we are asking the Court to do here.  Everything

2    that is necessary is already in front of the Court because it

3    was referenced in the complaint.  You have the complaint

4    itself.  You have his Facebook page and the video that he

5    published, and you have the defendants' uses, the videos and

6    the screen grab.

7              Courts have dismissed, without discovery, cases on

8    fair use grounds when they have that material in front of them.

9    That happened in the <u>Adjmi v. DLT Entertainment</u> case and in the

10   <u>Arrow Productions v. Weinstein</u> case, both in the Southern

11   District.  Those were motions for judgment on the pleadings

12   under Rule 12(c), but of course the standard was the same and

13   there was no discovery.

14             And as I just mentioned, in the Bloomberg case that

15   happened as well.  The case was dismissed without discovery.

16   Now, it was treated as a summary judgment motion in that days,

17   but effectively the same kind of information was in front of

18   the Court as you have here.  And that's all that the Court, I

19   offer, would need to dismiss the case on fair use grounds.

20             While plaintiff argues that it's premature to dismiss

21   on fair use, he doesn't identify any discovery that he could

22   get or would like to get that would in fact bear on the fair

23   use analysis.

24             THE COURT:  Well, he wants to show you are

25   profit-making organizations, a matter of which I could take

1    judicial notice.

2              MR. BIERBAUER:  I believe you can take judicial notice

3    that we are news organizations that make a profit and that

4    cases have been very consistent in holding that the factor of

5    commercial use is essentially irrelevant when you are talking

6    about news because in America most news organizations are

7    profit making and, therefore, that factor has very little

8    weight.

9              THE COURT:  At least they hope to be.

10             MR. BIERBAUER:  They do their best, your Honor.

11             Unless there are questions about whether our motion to

12   dismiss is appropriate, I will go on and talk about the four

13   fair use factors.

14             THE COURT:  Look, you got, between you and the other

15   defendants, about another five or ten minutes, so use the time

16   any way you want to use it.

17             MR. BIERBAUER:  Well, I'll very quickly then go

18   through the four fair use factors.  Here it's clear that the

19   use is transformative.  He concedes in his opposition that the

20   purpose of his video was to show this event, this particular

21   birth, to friends and family.  Obviously, the purpose of

22   covering it as news was very different.  The purpose of

23   covering it as news was to highlight the trend of people

24   putting live streams on Facebook publicly and to question, in

25   the form of commentary, whether this particular live stream was

1   perhaps taking that trend a bit too far.  This is clear from

2   defendants' reports on their face, and it's also clear that

3   this was quite a public phenomenon when they reported on it,

4   because they noted that there were thousands of people who

5   watched the video as it was being live streamed by the

6   plaintiff.

7           The second factor is the nature of the copyrighted

8   work.  Here the work is informational.  There is very little

9   artistic or creative content to it.  It is a smartphone video

10  of a delivery room and the events that are taking place there.

11  It was, as Mr. Sholder pointed out, previously published.  It

12  had been published to Facebook's 1-billion-plus members 24

13  hours before any of us picked it up.

14          Regarding the amount and substantiality of use, this

15  is, you know, very clear in this case.  You are talking about

16  22 seconds or 30 seconds or a screen grab of a 45-minute video.

17  Similarly short excerpts are regularly found to be fair use.

18  And it's no more than was needed to report and comment on this

19  particular phenomenon, this unprecedented use of Facebook's

20  live feature, to publicly exhibit a birth.  It was just enough

21  to show everyone who was watching on TV some flavor of what

22  those who had actually watched the video might have seen.

23          And, fourth, there is no market here and there can be

24  no effect on the market.  There is no market alleged in the

25  complaint.  The plaintiff concedes in his opposition that he

1  didn't intend the video to be seen by anyone besides friends

2  and family.  He doesn't say that he was going to sell it.  And,

3  of course, there is no usurpation of any market here because

4  there are not substitutes.  Anyone who wanted to watch the

5  whole 45 minutes and see the baby being born would have to go

6  and watch the video that plaintiff put up on Facebook, and

7  anyone who wanted to see a news report that put it in context

8  and commented on the trend that was reflected by this

9  particular unprecedented use of live streaming would watch the

10  news reports, so they are not substitutes for each other.

11       And with that, I would reserve time for reply or for

12  any of my codefendants to make statements.

13       THE COURT:  All right.  Thank you very much.

14       Mr. Siegel, do you want to --

15       MR. SIEGEL:  I don't have anything to add, your Honor.

16       THE COURT:  Mr. Sholder.

17       MR. SHOLDER:  Yes, your Honor.

18       There are a few issues here that are unique to COED

19  Media, one of which is somewhat related to the fair use

20  argument, and that's the de minimis use point that we had made

21  in our opposition.  That point being that de minimis fragments

22  that are used don't constitute infringement because there is no

23  substantial similarity if it's such a small portion of the work

24  that there -- while there may be factual copying, there can't

25  be said to be actionable copying.

1    It's fairly clear that this is probably the smallest

2  fraction of this work that one could possibly use to comment on

3  it.  One screen grab of one frame of a 45-minute video, as

4  we've mentioned in our brief, is about .01 percent of the

5  entire work.  And you're comparing -- the relative basis of

6  comparison is the work itself, the copyrighted work.  So no

7  more than was necessary to comment on this work in the context

8  of fair use was used.  And as a matter of law this simply isn't

9  enough to rise to the level of substantial similarity required

10  for actual copying.

11    As Mr. Bierbauer noted, even the plaintiff says a

12  side-by-side comparison of the copyrighted work and the

13  allegedly infringing work can be made at the pleading stage,

14  and doing just that, it's clear that the screenshot used by

15  COED Media in its article should be deemed de minimis as a

16  matter of law.  And there are cases that dismiss claims of

17  infringement on de minimis grounds at the motion to dismiss

18  phase, particularly your Honor's decision in Tufamerica v. WB

19  Music Corp. and Poindexter v. EMI, also in the Southern

20  District.  Those are right on point.

21    The other claim that's unique to COED Media, I'll move

22  on to the DMCA claim if your Honor doesn't have any questions

23  with respect to de minimis use.

24    THE COURT:  Let's talk about you had two alleged uses,

25  both involving, as I remember, the same screenshot.  One was on

a -- I'm not sure what it was exactly, a Facebook page,

something, and it had a certain amount of editorial comment

with respect to the allegedly infringed work.  The other was on

a Pinterest page.

          MR. SHOLDER:  Yes.

          THE COURT:  Now, for those a little younger than I am,

that may mean something.  To me, it is meaningless.  And there

is nothing that I could find in the record, save for a shot of

the Pinterest page, which on the face of it seems to have

nothing more than the screenshot on it, substantially anyway, I

have no idea how the analysis -- well, that's too strong a

statement, but the analysis may well be different with respect

to that particular page, at least as regards fair use and maybe

beyond.  Do you want to address that?

          MR. SHOLDER:  Of course, your Honor.

          I think the analysis is not really different at all.

I will agree that --

          THE COURT:  To be more specific, there is no

commentary evident on --

          MR. SHOLDER:  Correct.  The commentary appears in the

article, which was on one of COED Media's Web properties.  The

Pinterest page included a screenshot of the video with the

headline of the article below it linking back to the article.

So the purpose of the --

          THE COURT:  So what was the headline on the Pinterest

1   page, please?

2          MR. SHOLDER:  It was the same headline as the COED

3   Media article.  I can tell you in a moment.  "Man uses Facebook

4   to live stream his wife giving birth and, yeah, it's pretty

5   weird."

6          THE COURT:  Well, it doesn't say "and, yeah, it's

7   pretty weird."

8          MR. SHOLDER:  Let me confirm.  Let me just check the

9   complaint and make sure I am not misstating anything.

10         (Pause)

11         Yes, it does.

12         THE COURT:  OK.

13         MR. SHOLDER:  And the visitor to the Pinterest page

14  can then following that link back to the collegecandy.com

15  article that contains the rest of the commentary.  It's the

16  same screenshot used for the same purpose, to comment on what

17  my client thought was the strange nature of this phenomenon.

18         Granted, the commentary doesn't appear on the

19  Pinterest page itself, but we think the analysis is the same,

20  particularly the de minimis use analysis because it is the same

21  screenshot of the single frame from the video.  But for

22  purposes of fair use, it is transformative in the same way that

23  the article is transformative in that it is being used for a

24  different purpose.  The amount and substantiality is the same.

25  It's very small and it's certainly not the heart of the work.

1   This isn't a shot of the baby actually being born.  And as I

2   mentioned, that links back to the article, which provides the

3   full commentary.

4           THE COURT:  OK.  Anything else?

5           MR. SHOLDER:  With respect to the Section 1202 claim,

6   the DMCA claim, as a threshold matter, I think the most

7   straightforward way to dispose of this claim is that if the use

8   of the screenshot is deemed to be fair use, then there can be

9   no intent to conceal or encourage or otherwise cause further

10  infringement downstream.  The intent element of the Section

11  1202 claim is very important here, and I think it can be

12  resolved on a motion to dismiss because the allegations in the

13  complaint clearly show that COED Media credited the author, or

14  whatever pseudonym he was using on his Facebook page, in the

15  article and then, as I mentioned before, linked directly back

16  to the original source material so that anybody who wanted to

17  see the video could see the video and could see who it was

18  attributed to.  So the intent element I think is key here.  But

19  I don't even know that your Honor needs to get to that because

20  if the use is deemed fair, then the intent element of Section

21  1202 is defeated, anyway.

22          THE COURT:  OK.  Thank you.

23          MR. SHOLDER:  Thank you.

24          THE COURT:  Ms. Tsyvkin.

25          MS. TSYVKIN:  Your Honor, it remains the plaintiff's

1    contention that this motion for fair use is premature.  There

2    is a plethora of cases in the Second Circuit, most of which is

3    listed by the plaintiff on page 3 of the opposition, that

4    clearly states this is a fact-specific inquiry that deserves

5    and requires some discovery, some record to be developed.

6              THE COURT:  And precisely what?

7              MS. TSYVKIN:  Well, that is an excellent question.

8    For example, if we are going to talk about transformative use,

9    which is -- you know, we all concede that that's the most

10   important part of the inquiry, we need to talk to the editors

11   who decided that this was a newsworthy story.

12             THE COURT:  Why?

13             MS. TSYVKIN:  To figure out whether this is the kind

14   of use that rises to the level of transformative use.  We need

15   to talk to --

16             THE COURT:  Why don't we talk to Professor Nimmer?

17             MS. TSYVKIN:  Well, this is a fact inquiry, correct?

18   So we can -- there is --

19             THE COURT:  Transformative use is a conclusion of law,

20   isn't it?

21             MS. TSYVKIN:  But it is entrenched in the facts.

22             THE COURT:  And we know the facts.

23             MS. TSYVKIN:  But do we?  And our contention is that

24   we don't know enough of the facts to justify --

25             THE COURT:  I want to know from you exactly what facts

1    we don't know that are material to anything here.

2           MS. TSYVKIN:  I would like to see -- in the course of

3    discovery, I would like to see what the editors told the hosts

4    to say, any notes that the hosts might have had that will give

5    us a fuller and more complete picture of whether this was in

6    fact newsworthy.  And your Honor's original question goes

7    directly to that point.

8           THE COURT:  Excuse me.

9           MS. TSYVKIN:  Yes.

10           THE COURT:  There are lots of things in life I would

11    like to see.  I might be curious to know what was going through

12    your client's mind when he decided to do this.  Humph?  But I'm

13    extraordinarily skeptical as to whether it matters to anything

14    as a legal matter.  He did what he did.  We all know what he

15    did.  He admits what he did.  Consequences may follow from that

16    either for him or the other side.

17           So to respond to a question from a judge in this

18    procedural posture as to what facts do you want to discover and

19    why are they material, an answer that starts "I would like to

20    know" doesn't really help very much, because it doesn't address

21    the question of why what you would like to know matters to

22    anything.

23           MS. TSYVKIN:  OK.  Perhaps I can clarify, your Honor.

24           Here's what I would -- OK.  I'll stop at that

25    formulation.  We need to know whether the decision that these

1  broadcasters came to as far as whether this is newsworthy were

2  actually in place or was this purely for entertainment value.

3  This is something that happened and I believe --

4             THE COURT:  How does that matter?

5             MS. TSYVKIN:  It determines whether this was

6  transformative.  It determines whether this was newsworthy.  It

7  determines whether they had any --

8             THE COURT:  Let's suppose for the sake of argument --

9             MS. TSYVKIN:  Yes.

10            THE COURT:  You may be too young for the reference,

11  almost certainly you are, but there is a magnificent scene,

12  played by Marlene Dietrich and the name of the actor, long

13  since deceased, will come back to me, at the conclusion of a

14  great movie called "Witness for the Prosecution" where suddenly

15  all is revealed.  Now, suppose somebody did a substantial

16  knock-off of that scene and posted it on the Internet for its

17  entertainment value maybe, for the sake of argument, to poke

18  fun at whether the scene as originally played was actually a

19  believable hypothesis.  Suppose somebody did that and they did

20  it purely for entertainment value.  Now -- and let's assume

21  further that in terms of the quantitative nature of the alleged

22  appropriation, it is no different than what we have here.

23  Let's assume away all of those other factors.  It would be fair

24  use, wouldn't it?

25            MS. TSYVKIN:  It would be because there is specific

1    case law saying that parody is protected.

2                THE COURT:  I didn't say anything about parody.

3                MS. TSYVKIN:  I believe you said they were making fun

4    of the fact that it is implausible that this was happening.

5                THE COURT:  If I used the phrase "making fun," it's

6    not necessary to my point.  Maybe it was done with an intent of

7    criticism, scholarly criticism by a professor at the NYU Film

8    School for use in a seminar and on public media.

9                MS. TSYVKIN:  Well, then there would be other factors

10   that would come into play, correct?  We would have to know --

11               THE COURT:  I'm going to take the "seminar" out of the

12   hypothetical.

13               MS. TSYVKIN:  OK.

14               THE COURT:  Now it is a film student.  Then take the

15   film student out.  Now it is some informed citizen who just

16   thinks the scene as a matter of film doesn't really work and

17   here's why and illustrates it with this hypothetical creation.

18               MS. TSYVKIN:  Well, it doesn't require a professor or

19   a large audience to decide that something is a parody, yes, but

20   that could be protected because that is exactly --

21               THE COURT:  I'm not talking about a parody.  I'm

22   talking about serious criticism.

23               MS. TSYVKIN:  Serious criticisms, if it enriches a

24   society, as the case law requires, if it adds something, it

25   becomes transformative as a result of adding a new aesthetic, a

1   new idea, new looks, exactly what Cariou v. Prince enumerates,

2   yes, absolutely, but this does not --

3          THE COURT:  It is perfectly obvious that at least what

4   the networks did, and probably COED, is serious criticism.  I

5   mean, the whole point of these broadcasts was:  Look what this

6   guy did.  This is weird.

7          MS. TSYVKIN:  Is that --

8          THE COURT:  And that's news.

9          MS. TSYVKIN:  I would argue that that does not rise to

10  the level of serious criticisms.  If you go over what the --

11  for the defendants line-by-line what the hosts said, they were

12  very scant comments.  It does not rise to the kind of example

13  that you cited where someone is offering serious criticism that

14  enriches our society, I would say yes, but this is not.  This

15  is merely, you know, here's what this guy did.  You know, let's

16  play it and see how many people we can get to turn -- tune in

17  and also how many people can come to our website and look at it

18  and click on our -- that's my intention.

19         THE COURT:  OK.  Well, I hear you.

20         MS. TSYVKIN:  Yes.  And, also, when you started with

21  the question originally to the defendants about does the

22  intention matter whether, you know, you would have broadcasted

23  the same video if it was just, you know, a few people saw it,

24  if you got ahold of it, I think, you know, that question goes

25  exactly to our contention.  It was just entertaining.  They got

1  ahold of something that was entertaining, and they knew it

2  would drive traffic to their website and viewers to their show,

3  which is why they repeated it.  In the case of NBC and ABC, you

4  know, they aired it twice in a kind of a sensational thing that

5  occurred.

6  THE COURT:  That's pretty much what news reporting is

7  nowadays, isn't it?

8  MS. TSYVKIN:  To enrich our society.  And we argue

9  about the larger question, whether the sensationalizing of a

10 technological error in the person's privacy, it is an

11 unfortunate thing that happened.  No one -- you know, obviously

12 it is my client's fault for, you know, broadcasting

13 accidentally, absolutely.  We are not questioning that.

14 THE COURT:  While you focus on that, let me -- is this

15 whole notion that this was a mistake by your client supported

16 either by any allegations in your pleadings or any evidence, or

17 is it just an unsworn statement in your answering brief?

18 MS. TSYVKIN:  In my answering brief, it is an unsworn

19 statement.  However, this is exactly --

20 THE COURT:  So it's not properly before me on the

21 motion, is it?

22 MS. TSYVKIN:  Because none of these things are

23 properly before you on the motion.  They shouldn't be here.

24 It's not ripe for consideration.  This is the kind of thing

25 that would come out if discovery occurred.

25

1          THE COURT:  Am I to take that as a serious answer, am

2      I?  The complaint is not properly before me, the motion is not

3      properly before me --

4          MS. TSYVKIN:  I meant the motion is not ripe for

5      consideration.

6          THE COURT:  Yes.  But my question to you was that your

7      client's excuse for how this happened is not supported either

8      by allegations in his pleadings or in his memorandum and for

9      that reason is not properly before me at all on this motion;

10     isn't that true as a matter of law?  That's my question.

11         MS. TSYVKIN:  Well, it is as a matter of law, yes.

12         THE COURT:  OK.

13         MS. TSYVKIN:  It's not properly before you that it

14     occurred accidentally.

15         THE COURT:  All right.  Let's go on.

16         MS. TSYVKIN:  So our argument is that this is just too

17     early, and courts throughout this circuit and specifically in

18     the Southern District have agreed with us that this is a very

19     fact -- as we are learning in this argument, a very fact

20     specific inquiry that deserves a more developed record.  And

21     discovery is the proper vehicle for that, not submissions,

22     declarations, and various extraneous things that the defendants

23     have turned in that accompanied their motions to dismiss at

24     this early stage.

25         THE COURT:  OK.  Anything further?

1          MS. TSYVKIN:  If your Honor decides to go on to the

2     actual fair use factors, I definitely believe that this use is

3     not transform -- if you do, you know --

4          THE COURT:  You mean, if I am to decide the motion at

5     all?

6          MS. TSYVKIN:  If you are deciding the motion on the

7     merits of whether the factors are present, I would -- you know,

8     I believe we could be heard on that.  We don't believe the use

9     is transformative because they just merely published parts of a

10    video that were essentially telling the story.  So it's a

11    complete substitute for the video.  They claim that it wasn't

12    large segments of a 45-minute video --

13         THE COURT:  How am I to take seriously an assertion by

14    a lawyer that, for example, COED Media's publication was a

15    complete substitute for the video when it consisted of

16    .012 percent of the video?  Am I to take that as a serious

17    statement, or am I to take that as rhetorical hyperbole?

18         MS. TSYVKIN:  Obviously we believe that the defendants

19    should be treated separately and there are different facts that

20    apply to each defendant.  And in the case of COED, obviously

21    it's not as strong of a case, and I would argue that the fact

22    that there is substantiality is not there.  My papers reflect

23    that.  That in the case of COED, there is a screenshot that

24    they used both on their Pinterest and --

25         THE COURT:  So isn't the concession on quantitative

1    substantiality fatal to your case against COED?

2              MS. TSYVKIN:  It's absolutely not because there are

3    other factors.  The main factor is transformative use and --

4              THE COURT:  Well, but you're overlooking their de

5    minimis argument, which is really at the heart of their motion.

6    They say that the amount of the appropriation, if it can be

7    called that, is .012 percent of the allegedly infringed work

8    and it does not rise to the requisite level of quantitative

9    substantiality to permit a finding of substantial similarity.

10   Now, if you agree that it doesn't rise to that level, that's

11   the end of your case against them at least on the question of

12   copyright infringement.

13             MS. TSYVKIN:  Well, on the case of de minimis use I

14   view as separately from the consideration of the substantiality

15   argument.

16             THE COURT:  That's --

17             MS. TSYVKIN:  And there's also -- all right.  Go

18   ahead.

19             THE COURT:  But you made a statement.  The statement

20   seemed to me to be quite likely a dispositive concession on the

21   question of substantial similarity, and I'm trying to find out

22   whether that's really what it is.

23             MS. TSYVKIN:  What it is is we cite the case in the

24   opposition out of this particular district, Judge Wood's

25   decision in Devocean Jewelry, that treats a screen grab from a

H2FDKANM

1    video as eligible for its own statutory award.  So depending on

2    how many screen grabs you have, you get one statutory award per

3    screen grab and that's --

4              THE COURT:  Even in the absence of substantial

5    similarity?

6              MS. TSYVKIN:  Fair use was not an issue there.  It was

7    just a question of whether de minimis use is --

8              THE COURT:  Tufamerica was decided on the basis of

9    substantial similarity, a holding that given the accused and

10   the allegedly infringed work -- I'm sorry, I misspeak there,

11   the copyrighted work and the accused work, it was impossible

12   for any reasonable trier of fact to find either quantitative or

13   qualitative substantiality without regard, as I remember the

14   case, to the question of infringement -- excuse me, to the

15   question of fair use; right?

16             MS. TSYVKIN:  I mean, that's correct, yes, sir.

17             THE COURT:  OK.  So are you telling me that you agree

18   that at least in the case of COED Media, that their use of

19   .012 percent of the video is a concession that there was no

20   quantitative substantiality and, therefore, you lose without

21   regard to fair use as to that defendant on the basis of

22   substantial similarity?

23             MS. TSYVKIN:  I will not concede the fact that it's on

24   the de minimis --

25             THE COURT:  So why not?  Explain.

1          MS. TSYVKIN:  Because we believe that if it is

2     possible for a screen grab to get a statutory award --

3          THE COURT:  It's possible that the Lord God will come

4     down into this courtroom in a burning bush, but we are not

5     deciding the case on that ground.

6          MS. TSYVKIN:  Yes, we are deciding the case based

7     on -- in the light most favorable to the plaintiff at that

8     point.

9          THE COURT:  Yes.  But in the light most favorable to

10     the plaintiff involves reasonable inferences and likelihoods,

11     not theological beliefs or hopes.

12          Let's move on.

13          MS. TSYVKIN:  All right.  So just going over the

14     factors again, we believe that the use was not transformative,

15     and if it was transformative, it was minimally so, just because

16     the comments that the hosts made during the shows were just

17     kind of, "ouch."  I mean, does that really imbue our society

18     with a lot of values --

19          THE COURT:  It is social commentary.  That's what it

20     is.  I mean, perfectly obvious that it's social commentary.

21          MS. TSYVKIN:  I guess I just don't see how that rises

22     to the level that the Second Circuit asks us to.

23          THE COURT:  Well --

24          MS. TSYVKIN:  And what they require.

25          THE COURT:  I imagine they may ultimately decide that,

1    but.

2              MS. TSYVKIN:  And, also, there are cases, specifically

3    North Jersey Media Group v. Pirro, where the Court clearly says

4    that simply taking fair use refuge under the umbrella of news

5    reporting is not acceptable.  It was rejected in that case.

6    You can't just say it's newsworthy.  That would mean, you know,

7    basically it doesn't apply, they can do anything they want.

8    They could just take anyone's photograph, anybody's work,

9    anybody's video and if they deem it, you know, tangentially

10   newsworthy, they will play it and not properly utilize

11   licensing regimes, not compensate rights holders for their

12   work.  So just saying something is, you know, this is news,

13   especially --

14             THE COURT:  Now, if I accept your client's

15   statements -- I assume they are your client's but I don't know

16   that because you didn't put in an affidavit.  If I accept your

17   statements about what his intention and purpose was here with

18   respect to dissemination, namely, that this was to be live

19   streamed to somewhat less than a billion people, to a close

20   group of friends and relatives, and it was never intended to go

21   public, doesn't that dramatically undercut you on fair use,

22   because there was no intent to commercialize, there was no

23   taking any market away from him, no matter what had been used

24   by the defendants, because that wasn't what he was about

25   anyway?

1    MS. TSYVKIN:  The market doesn't have to be intended

2 when the work was created.  So after the fact -- I mean, we all

3 know that --

4    THE COURT:  We all know he is trying to commercialize

5 these events.  I mean, that's clear.

6    MS. TSYVKIN:  But the market doesn't have to be

7 conceived of before it happens.  I mean, there is clear case

8 law --

9    THE COURT:  Yes, I understand all of that.  But what

10 was conceived beforehand, you are telling me, was that this was

11 private.  That was the intent, your client's intent.

12    MS. TSYVKIN:  Correct, sir.  And once this happened,

13 once this thing went viral -- and that's essentially what

14 happened, a lot of people -- a lot of broadcasters will concede

15 that, there is no reason that we can't, a lot of broadcasters

16 went ahead with this.  Several of them were, you know, also

17 defendants in this group of cases, related cases, and I might

18 say have already settled.  Similarly situated defendants have

19 settled the matter.  Obviously some reasonable institutions

20 believe that something wrong had occurred here.

21    THE COURT:  Well, that's absurd, with all due respect.

22 Everybody knows that, with rare exceptions, most commercial

23 enterprises in appropriate circumstances settle matters to

24 avoid nuisance, even matters that they believe are totally

25 lawful.  You know that.  I know that.  Every judge who has ever

1    sat in a courtroom knows that.

2         What happened here I neither know nor care, but simply

3    because other people settled proves absolutely nothing.

4         MS. TSYVKIN:  No, but it shows that something had

5    occurred and he realized that this thing was out of his

6    control.  It wasn't the case that only a few friends and family

7    saw the video.  Everyone saw the video.  It was all over the

8    news.  And if the market was created at that point, what case

9    law is there to say that that's too late, that the market has

10   to be conceived before he presses the button record.  That's my

11   point.  My point is that he -- the defendants created the

12   market --

13        THE COURT:  And now he wants to profit from it.  I

14   understand that that's your argument.  My question to you is

15   very different, but you haven't answered it.

16        (Pause)

17        MS. TSYVKIN:  We believe that if the defendants' use

18   usurps the market for the original, that satisfies the fourth

19   factor.

20        THE COURT:  OK.  Let's take that one.  How does the

21   .012 percent screenshot that COED posted usurp the market for a

22   45-minute video of a live birth?  Anybody who wants to pay to

23   see that video, or any part of it, was willing to do that, your

24   client is perfectly able, notwithstanding COED video's action,

25   to commercialize that; isn't that true?

1      MS. TSYVKIN:  We don't believe so.  We believe that

2  the clips that were selected by the defendants --

3      THE COURT:  I'm talking about COED.  We will get to

4  the others.

5      MS. TSYVKIN:  Again, as our opposition papers reply,

6  that factor is not as strong when it comes to COED.  But these

7  are all things that should be taken on balance.  None of these

8  factors are dispositive.

9      So when it comes to COED, when they have one screen

10  grab, as we say, in two places, then of course the argument is

11  different than a news broadcaster that has --

12      THE COURT:  So how much did NBC use?

13      MS. TSYVKIN:  NBC aired the segment twice, at 8 a.m.

14  and the 9 a.m. time --

15      THE COURT:  I'm sorry.  You always do better when a

16  judge asks you a question if you don't say to myself, boy, I

17  don't really want to talk about the answer to that question,

18  let me say something else.

19      How many seconds did NBC air?  Not how many times, not

20  what time of the day, not which show, how many seconds out of

21  45 minutes?

22      MS. TSYVKIN:  I believe it was around 30 seconds.

23      THE COURT:  OK.  And how many in the case of the other

24  defendant?

25      MS. TSYVKIN:  The CBS, I believe --

1          THE COURT:  CBS is not here.

2          MS. TSYVKIN:  CBS is not here.  ABC.

3          THE COURT:  Yes.

4          MS. TSYVKIN:  In the case of ABC, I believe it was --

5    let me just go through my papers.

6          (Pause)

7          Probably around the same, maybe a little more.

8          THE COURT:  OK.  So let's be charitable and say a

9    minute.  And you agree it was not as long as a minute in the

10   case of any of them, right?

11         MS. TSYVKIN:  Let's say they played the minute of the

12   video, yes, correct, sir.

13         THE COURT:  Yes.  But you agree that it was in fact

14   less than that in each case, right?

15         MS. TSYVKIN:  OK.

16         THE COURT:  All right.  So if we take this exaggerated

17   assumption of a minute, you've got something in the

18   neighborhood of 1/45th of your client's video, tops 2 percent,

19   right?

20         MS. TSYVKIN:  OK.

21         THE COURT:  And your position is that even the very

22   limited airtime given to the one network who used that on two

23   different broadcasts on one day, that was sufficient to permit

24   the case to go forward with respect, for example, to the factor

25   about whether they have usurped the market for

1   commercialization by your client of what he claims was this

2   unintentional bonanza, right?

3               MS. TSYVKIN:  Yes.

4               THE COURT:  OK.

5               MS. TSYVKIN:  Because -- may I elaborate?

6               THE COURT:  Sure.

7               MS. TSYVKIN:  If we were less charitable, for example,

8   to just 30 seconds, which is what it is, and the seconds that

9   were broadcast were telling the story of the video, meaning all

10  the more interesting, engaging, let's say, visceral parts of

11  the video were broadcast in those 30 seconds, then you would

12  say there is no need for the original video.  Why would anybody

13  go see the original video if they could just watch this and

14  their appetite for that kind of violation will be satisfied?

15  That's really the issue.  It is not the number of seconds that

16  it is on, it is the fact that it tells the narrative of the

17  video and it takes the heart of the video.

18              THE COURT:  Let's flip to a different sphere of human

19  endeavor.  I have forgotten how many games the World Series

20  went last year.  Does anybody remember?  Was it six?  Did the

21  Cubs get that far?  How did it come out?

22              MR. SIEGEL:  Seven.

23              THE COURT:  Seven games, OK.  So suppose what they had

24  done is that they somehow lawfully procured a video of the

25  seventh pitch to the seventh batter of the seventh game

H2FDKANM

1    identical to the copyrighted Major League Baseball broadcast of

2    the entire game.  And let's assume that Major League Baseball

3    does all that -- I'm sure they do -- and they want to

4    commercialize their video of the seventh game of the World

5    Series.  And what one of the networks did was that they

6    broadcast a 30-second video of the seventh pitch of the seventh

7    game to the seventh batter on their program saying, gee, so and

8    so won the seventh game of the World Series.  Here's a

9    screenshot -- not a screenshot but a short video.  Does the

10   plaintiff have a case?

11           MS. TSYVKIN:  I believe the MLB will believe there is

12   a case, yes.

13           THE COURT:  Yes, I know they will.

14           MS. TSYVKIN:  I receive much less --

15           THE COURT:  Half the people who come into this court

16   and lose all came in thinking they had a case.  All of the

17   people who come in and lose thought they had a case.  That's

18   not the question.  The question is do they have a case.

19           MS. TSYVKIN:  Part of the -- and I believe that this

20   is the case -- that the part of the Cubs game 7 of the World

21   Series is that last pitch and that's what's shown.

22           THE COURT:  I deliberately made the example otherwise.

23   I didn't ask you about the last seconds of the Cubs and Alabama

24   game or Aaron Boone's home run in the 13th inning against

25   Boston.

1          MS. TSYVKIN:  Or the last quarter of the Super Bowl,

2     right.

3          THE COURT:  OK.  So you are a better sports fan than I

4     am.  But let's stick with the hypothetical because that's what

5     we are dealing with here, something very close to it, anyway.

6          MS. TSYVKIN:  If it replaces the need to see the

7     original, if it usurps the market, the answer is yes.  Not --

8          THE COURT:  So I can look at the 30 seconds or the

9     screenshot and I can look at the 40-minute video, 45-minute

10    video -- and, you know, they call us judges because we're

11    supposed to do something and it's related to the word; it's

12    "exercise judgment" -- and I can make a judgment as to whether

13    it's conceivable that any rational person could conclude that

14    it usurps any market that hypothetically might exist for the

15    video.  And that's what the motion asks me to do.  And I'm

16    giving you every opportunity, at least I hope so, to convince

17    me why that judgment isn't what the defendants urge on me, and

18    I'm not hearing it.

19         MS. TSYVKIN:  I'm asking you that while you can make

20    the judgment as to that, that determination will only give you

21    the fourth factor.

22         THE COURT:  All right.  And I can certainly make the

23    judgment about whether it was newsworthy, whether it was

24    transformative.  What other judgment can't I make?

25         MS. TSYVKIN:  I believe that you would need more facts

1    to make a meaningful judgment about the market.  You would need

2    to know whether he tried to sell this thing afterwards, someone

3    to license it to afterwards.

4             THE COURT:  No.  He has filed complaints.  He alleged

5    the facts which he thought were material to the case.  There is

6    nothing about that in it.

7             MS. TSYVKIN:  But if we're considering the fourth

8    factor seriously as far as does this usurp the market or not,

9    aren't we kind of shortchanging ourselves if we are just going

10   by our intuition that there is no market for this, no one would

11   pay for this?

12            THE COURT:  It's not intuition.  Iqbal and Twombly

13   make it perfectly clear that even where there is an allegation

14   of a fact, the story's got to be plausible, in my judgment.

15   And here we have no allegations of fact.  We have the allegedly

16   copyrighted and the allegedly infringed work, and I look at

17   those two works and I say you haven't alleged, except in the

18   most conclusory terms, if that, that there was any market

19   impact, and even if you had, it's not plausible.  It is just

20   not plausible.

21            Now, you have an opportunity here.  We are on an

22   amended complaint as to at least one defendant.

23            MS. TSYVKIN:  We are.

24            THE COURT:  OK.  Do you want to wrap it up because I

25   have another matter coming on?

H2FDKANM

1    MS. TSYVKIN:  I mean, I was going to discuss the

2  merits of the COED DMCA claim, the fact that we believe we've

3  met the burden by attaching an example of the infringement.  Of

4  course, if everything hinges on the fair use and your Honor is

5  not going to rule on one without ruling on the other,

6  obviously --

7    THE COURT:  What facts permit a plausible inference

8  that there was requisite intent?  What facts have you pleaded?

9  I understand that you track the language of the statute, which,

10  you know, is essentially -- it's -- "boilerplate" has a

11  negative connotation so I won't use that word, but you've got

12  to have facts.  I mean, if you go back to the I guess it was

13  Bell Atlantic, which was an antitrust conspiracy case, the

14  complaint alleged that the defendants conspired, in violation

15  of Section 1 of the Sherman Act.  The Supreme Court said, not

16  plausible given the lack of facts here.  I mean, it said it.

17    MS. TSYVKIN:  And my argument is this is premature

18  because it occurred --

19    THE COURT:  They said that there, too.  The defense

20  said, we have the right to conduct discovery to see whether in

21  fact two or more defendants came to a meeting of the minds to

22  do that which the complaint alleged.  That was the whole case

23  in Bell Atlantic.

24    Now, you come along and you say their intent was bad

25  with respect to what you imagine to be intentional deletion of

H2FDKANM

1    copyright management information, but there are no facts

2    alleged.

3          MS. TSYVKIN:  But don't we know from BanxCorp. and

4    Morrell that basically those questions pertaining to the intent

5    are better suited for later on in the litigation process?

6    Isn't this exactly what they say, that as far as at the

7    pleading stage, if I have the existence of a CMI, the

8    allegation that this was removed, and that the removal was

9    intentional, isn't that enough to satisfy the pleading

10   standard?

11         THE COURT:  Well, that's the question I just asked

12   you.

13         MS. TSYVKIN:  We believe that it is at this -- I mean,

14   I hate to be always saying this is premature, but the fact of

15   the matter is these motions are premature.  It may turn out to

16   be that the defendants have a very strong case for fair use but

17   we just don't have enough facts on the record.  We don't have

18   enough facts on the record as to the CMI claim as far as what

19   their specific intent was.  And courts again and again in the

20   Second Circuit, in this particular district, have said these

21   are better suited for later on, at the summary judgment stage,

22   after there has been some kind of discovery.  As far as at this

23   stage, attaching an example of an infringement suffices.

24         THE COURT:  A fairly remarkable proposition.

25         OK.  Anything else?

1          MS. TSYVKIN:  No, your Honor.

2          THE COURT:  OK.  Thank you.

3          Anything from the defendants?

4          MR. BIERBAUER:  No, your Honor.

5          THE COURT:  OK.  The motions all are granted.  And

6   just a couple of comments, really.

7          Number one, I appreciate the effort all counsel had

8   put into a case that arises in a novel and, from a human

9   interest point of view, interesting context.  The briefs have

10  been very helpful.

11         I conclude, substantially for the reasons set forth in

12  the ABC Yahoo! brief, that this is fair use.  I don't mean to

13  comment adversely on the other briefs of the defendants on that

14  point.  I just found, Mr. Siegel, your brief to be right on the

15  money on that point, and I base the fair use conclusion

16  substantially on what's in that brief.

17         This was in each case a use squarely within the

18  preambulatory portion of Section 107 of the Copyright Act,

19  namely, criticism, comment, news reporting, which goes a

20  significant part of the distance toward a conclusion of fair

21  use.  I believe the use was transformative.  The amount and

22  substantiality of the portions used in relation to the

23  copyrighted work as a whole are very small in each case and, in

24  the case of COED Media, trivial and de minimis for sure.  And

25  there are no plausible allegations that would permit a

conclusion that the effect of the use on the part of any of the

defendants had any effect on any potential market for or any

value of the copyrighted work.

By these brief comments, I don't mean to narrow the

scope of my ruling on this.  It is substantially based, as I

say, on the arguments advanced in the ABC Yahoo! brief, but I

want to be sure to touch all the bases.

A couple of other comments.

I am not converting this motion into one for summary

judgment under Rule 12; rather, I'm applying the standard

applicable to 12(b)(6) motions.  I accept as true all factual

statements in the complaint.  I have drawn all reasonable

inferences in favor of the plaintiff.  I do not accept

necessarily legal conclusions in the complaint.  The complaint

must contain sufficient factual matter to state a claim that's

plausible on its face and in respects to which I have alluded

it has not done that.

I consider also the written or recorded statements,

that is to say, the videos and possibly one or two other

things, the screen grabs, but it's clear in context that are

attached to the complaint and statements or documents

incorporated into the complaint by reference and documents

possessed by or known to the plaintiff and upon which the

plaintiff relied in bringing suit.  Those are the relevant

standards in this circuit.

1    The 1202 claim against COED is dismissed for the

2 reasons advanced by COED and also made clear in my colloquy

3 with Mr. Sholder and with Ms. Tsyvkin in the course of the

4 remarks.

5    I would say, also, this.  The plaintiff, of course, if

6 he really meant me to consider this assertion that this all

7 happened by virtue of a terrible mistake or blunder on his part

8 in that his intention was to live stream this on Facebook only

9 to a select group of friends and relatives, what should have

10 been done is that the complaint should have been amended to

11 make those assertions and, in failing that, an affidavit or

12 declaration should have been submitted in opposition to the

13 motion, neither of which was done.  So as Ms. Tsyvkin properly

14 acknowledged, this narrative, that appears only in an unsworn

15 answering brief, is not properly before me and as a technical

16 matter it's not for my consideration here.

17    But I go further.  Even if I accepted as true every

18 word of it, what we have here is a sad accident, not a

19 copyright infringement and not a violation of the DMCA.  I'm

20 very mindful, as possibly something I said earlier might have

21 revealed, that there is something of a generational gap between

22 people my age and everybody else in the courtroom right now

23 with respect to technology.  Nonetheless, I have sufficient

24 knowledge and experience to know people make mistakes.  It

25 could have happened.  It could have happened that

1    Mr. Kanongataa made exactly the mistake he claims he made.  I

2    don't really have any particular reason to doubt it.  I don't

3    mean to say anything negative about his credibility.  And

4    assuming that's what happened, it's too bad.  He has my

5    sympathy in that regard on those assumptions.  But the fact is

6    the things that happen in this life to people, without any real

7    culpability on their part, sometimes don't turn out the way

8    they hoped, and sometimes they turn out to be newsworthy.

9            Now, I don't mean to draw an analogy that's in any way

10    material to the resolution of the case, but when Mr. Zapruder

11    was standing along Dealey Plaza in Texas on November 22, 1963,

12    taking a movie of President Kennedy's motorcade, I'm sure the

13    farthest thing from his mind was that he would wind up filming

14    the President of the United States taking a bullet to the brain

15    and that his movie would be maybe the most newsworthy event of

16    the last 50 years -- 60 years, whatever it is now, it is a long

17    time.  I don't know what he thought about the publicity.  I

18    don't know what he thought about his movie being played

19    millions of times all over the world.  But stuff happens.  And

20    sometimes it's newsworthy and sometimes it's a proper subject

21    of social commentary or criticism, or whatever you want to call

22    it, but it's something that the world has a right to know.

23            I'm not deciding this is a constitutional case, but

24    there are values in the First Amendment that resonate with this

25    resolution, and they've got to be respected maybe now more than

1   ever.

2        And so the case is dismissed.  Certainly, the

3   plaintiff has a right to take it to the Court of Appeals, if he

4   wants to do that.  Maybe they'll see it differently.  But the

5   phrase that came to my mind is the old Latin phrase I learned a

6   long time ago, *"de minimis non curat lex*."  Look it up.

7        OK.  Thank you, all.  It was very helpful.

8        THE LAW CLERK:  All rise.

9

10                              -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25